IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| JOSEPH HOWARD | § | PLAINTIFF |
|---|---|---|
| | § | |
| v. | § | CAUSE NO. 1:10CV327 LG-RHW |
| | § | |
| VT HALTER MARINE, INC. | § | DEFENDANT |

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the Motion [28] for Summary Judgment filed by Defendant VT Halter Marine, Inc. Plaintiff Joseph Howard has responded, and VT Halter has replied. After due consideration of the submissions, it is the Court's opinion that there are questions of material fact for the jury. Accordingly, the Motion will be denied.

FACTS AND PROCEDURAL HISTORY

Howard was employed by VT Halter at the Moss Point, Mississippi facility for slightly more than one year. At the time of his termination on May 3, 2010, he had two disciplinary notes in his employee file. Both involved absences. The first was a verbal warning given on February 18, 2010. Mot. Summ. J. Ex. B-3, ECF No. 28-2 p. 17. The statement reads:

> Regular, predictable attendance is an essential function of your job. Your attendance has been unsatisfactory and has now become unacceptable. You also do not use the call-in line to report absences which can also be considered unexcused. Hereafter, your attendance must improve or further disciplinary action will be taken, up to and including termination.

One month later, on March 16, 2010, Howard received a written warning without suspension. Mot. Summ. J. Ex. B-3, ECF No. 28-2 p. 18. The statement is an

escalation of the verbal warning:

> Regular, predictable attendance is an essential function of your job. Even after previous warnings your attendance has been unsatisfactory which is unacceptable. Also, you are still not using the call-in line to report absences which can also be considered unexcused. Hereafter, your attendance must improve or further disciplinary action will be taken, up to and including termination.

Approximately one month later, on April 26, Howard began feeling ill at work. He alleges he went to the safety office, where Dan Claffey, the Safety Inspector, checked his blood pressure. Although it was normal, Claffey told Howard "to go home until [he] was 100%." Pl. Resp. Ex. C ¶ 2, ECF No. 33-3. Claffey then called Howard's supervisor Jerry Cochran to the safety office and informed Cochran that Howard was too sick to work and was being sent home. *Id* at ¶ 3. Claffey loaned his cell phone to Howard so that Howard could call his wife to pick him up. *Id.*

Once at home, Howard went to bed for the next two days with a spiking fever, and was "in and out of consciousness." *Id.* at ¶ 4. He "vaguely" remembers his wife getting him out of bed and bringing him to the hospital on the second day - April 28. *Id.* at ¶ 5. He was diagnosed with and treated for bacterial pneumonia and given a prescription for antibiotics. His wife called Dan Claffey when they were leaving the hospital that afternoon to inform him that Howard had just gotten out of the hospital with bacterial pneumonia. Pl. Resp. Ex. D ¶ 4, ECF No. 33-4. Claffey told her that was fine, and that Howard should get better and return to work. *Id.* Howard returned home and to bed.

Howard finally felt well enough to get out of bed the next morning. *Id.* He

phoned Claffey at around 10 a.m. to give an update on his condition. He asked Claffey to tell Cochran that he had been in the hospital and would return to work the next day if he was able. He also asked Claffey to have Cochran bring his paycheck to the facility gate so that he could pick it up at 4:00 p.m. Pl. Resp. Ex. C ¶¶ 11-12, ECF No. 33-3. When Howard and his wife arrived at the gate, the check was not there. Cochran brought it shortly thereafter, and Howard was able to tell Cochran about his medical condition and treatment. Cochran did not accept the offered doctor's excuse, telling Howard to bring it with him on Monday. *Id.* at ¶ 13.

On Monday, May 3, Howard reported to the Human Resources Manager, Debbie Warren. Warren advised Howard he had been terminated for violating the company's attendance notification policy. Mot. Summ. J. Ex. B ¶ 3, ECF No. 28-2. The policy states:

> If you must be absent from work for any reason, **you must notify the Human Resources department or your supervisor** immediately but no later than the time you normally report for work to receive sick pay if all other eligibility requirements have been met. **Three (3) consecutive days of unreported absences will be considered a voluntary resignation**. If possible, absences should be prearranged with your supervisor and kept to a minimum. Excessive absences (including being late and leaving early) even if excused could jeopardize your continued employment with the company.

Mot. Summ. J. Ex. B-1 p. 2, ECF No. 28-2 p. 5 (emphasis added). Warren determined that Howard should be terminated because he had failed to report his absences on April 27, 28 and 29, to the Human Resources department or his supervisor, Cochran.

Howard filed this lawsuit alleging that his termination violated the Family and Medical Leave Act, the Americans with Disabilities Act, the Rehabilitation Act, and

the Employee Retirement Income Security Act. He has since dismissed all but his Family and Medical Leave Act claims. *See* Stipulation of Partial Dismissal, ECF No. 31.

Howard's FMLA claims are that VT Halter failed to notify him of his eligibility for coverage, and terminated him for absences that were covered by the FMLA. These are claims of interference with substantive FMLA rights. *See Mauder v. Metro. Transit Auth.*, 446 F.3d 574, 580 (5th Cir. 2006). VT Halter moves for summary judgment on the grounds that Howard's absences were not covered by the FMLA because he failed to follow VT Halter's usual and customary attendance/call-in procedures. Howard argues that he should be exempted from complying with VT Halter's call-in policy, because his case presents unusual circumstances.

## Discussion

Under the FMLA, employees may take up to twelve weeks of time off for medical reasons, 29 U.S.C. § 2612(a), and it is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" this right to take approved leave. *Id.* § 2615(a)(1).

Department of Labor regulations state that an employer may impose notice requirements on an employee seeking to take unexpected FMLA leave. Two regulations are most relevant to the issue presented by VT Halter. The first provides:

> When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case. It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and

customary notice requirements applicable to such leave. *See* § 825.303(c). Notice may be given by the employee's spokesperson (e.g., spouse, adult family member, or other responsible party) if the employee is unable to do so personally. For example, if an employee's child has a severe asthma attack and the employee takes the child to the emergency room, the employee would not be required to leave his or her child in order to report the absence while the child is receiving emergency treatment. However, if the child's asthma attack required only the use of an inhaler at home followed by a period of rest, the employee would be expected to call the employer promptly after ensuring the child has used the inhaler.

29 CFR § 825.303(a). The second provides:

When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require employees to call a designated number or a specific individual to request leave. However, if an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her condition is stabilized and he or she has access to, and is able to use, a phone. Similarly, in the case of an emergency requiring leave because of a FMLA-qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved. If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied.

29 CFR § 825.303(c).

Howard agrees that he did not follow his employer's call-in procedure, but argues that his failure to do so is excused by unusual circumstances. Specifically, he was very ill and semi-conscious for most of the three days he did not report for work. His wife states in her affidavit that,

He slept all that afternoon [April 26], and all the next day. He was in and out of consciousness. He had a high fever. He went from being profusely sweaty to having chills. He was in a semi-delirious state. He did not get out of bed at all on Tuesday, April 27, 2010.

> On the morning of Wednesday, April 28, 2010, he was burning up with fever. I got him out of bed and took him to the hospital. We got to the emergency room at Singing River Hospital sometime after 9 a.m. He was there for about 6 hours. He was discharged mid-afternoon.

Resp. Ex. D ¶¶ 2-3, ECF No. 33-4.

According to Howard's affidavit, he was feverish and in and out of consciousness on April 27 and 28. Resp. Ex. C ¶4, ECF No. 33-3. He only vaguely remembers the trip to the hospital on the 28th. *Id.*, ¶5. After he received fluids in an IV drip he began to realize where he was and what was going on. *Id.*, ¶6. He was unable to communicate with anyone at his workplace until the next morning, the 29th, at 10:43 a.m., when he called Claffey. *Id.*, ¶¶1, 9-10.

VT Halter argues that this account of Howard's condition is belied by the medical records, which show that he was admitted to the hospital at 8:30 a.m. and discharged approximately two hours later, at 10:40 a.m. Resp. Ex. C.2, ECF No. 33-3 p.6. His chief complaint upon admittance was "cough, congestion." He was described as presenting with:

> malaise, cough, congestion, sweats, diaphoresis, cough [sic] up green mucous. He has been having some pain in his back a little bit. Feeling under the weather. No vomiting or diarrhea. He has been drinking plenty of fluids and having good urination. No shortness of breath. No abdominal pain. No syncope. No palpitations. No rash or joint pains.

*Id.* at 8. The physical exam revealed that he "looks fairly well," awake, alert, exhibiting no overt distress and having a body temperature of 98.8 degrees. *Id.* The doctor stated that "[t]his well appearing gentleman appears to have what I think is a possible bronchitis." *Id.* at 9. After examining x-rays, the doctor's diagnosis was acute

right lower lung pneumonia. *Id.*

Thus, while Howard and his wife describe his condition as feverish and lapsing in and out of consciousness for at least two days, he reported no fever or loss of consciousness to his medical care providers. Nevertheless, the differences in the descriptions of Howard's medical condition present questions of fact for the jury to consider. Viewing the evidence in the light most favorable to Howard, the Court cannot say that as a matter of law the condition he describes is not an instance where the regulations required his employer to make an exception to enforcement of its call-in procedure. *See Watson v. Afco Steel, LLC*, No. 4:09CV660-WRW, 2010 WL 4269235, *4 (E.D. Ark. Oct. 28, 2010) (whether "sleepiness" was an unusual circumstance was question of fact). Accordingly, summary judgment will be denied.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion [28] for Summary Judgment filed by Defendant VT Halter Marine, Inc. is **DENIED**.

**SO ORDERED AND ADJUDGED** this the 10th day of June, 2011.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE